IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VICTORIA RENEE MCKOY AND DESIREE WRIGHT LOVINS, *individually and on behalf of persons similarly situated,* | |
| *Plaintiffs,* | CIVIL ACTION FILE |
| *v.* | NO. _____ |
| BIG PICTURE LOANS, LLC, MATT MARTORELLO, ASCENSION TECHNOLOGIES, LLC F/K/A BELLICOSE CAPITAL, LLC, DANIEL GRAVEL, | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiffs, Victoria Renee McKoy and Desiree Wright Lovins ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, Big Picture Loans, LLC, Matt Martorello, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, Daniel Gravel (collectively "Defendants"), they allege as follows:

# I. INTRODUCTION

1.   This case involves the online payday lending industry[1], which takes advantage of desperate, poor Americans needing quick access to money by charging unconscionably high interest rates, often exceeding 550%. Payday lenders, such as Big Picture Loans, LLC, claim that they are above the law because they are supposedly wholly owned by a Native American tribe. However, lurking in the shadows, there is a complicated corporate management structure attempting to hide the fact that non-tribal members reap the overwhelming

---

[1] The term "payday loan" is generally recognized as "a loan of short duration, typically two weeks [coinciding with the borrower's next payday], at an astronomical interest rate. Payday loans are the current version of salary buying or wage buying." *Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 343 n.5, 793 S.E.2d 357, 363 n.5 (2016), *quoting Clay v. Oxendine*, 285 Ga.App. 50, 50 (1), 645 S.E.2d 553 (2007) (internal quotations and citations omitted). Similarly, an installment loan is a small-dollar consumer loan with terms that allow for the repayment of the debt over a period of months, generally with bi-weekly or monthly payment terms. In Georgia, the consumer finance laws address the legality of "payday loans" and "installment loans" through the same lending statutes, which regulate the lending of $3,000 or less at interest rates that exceed eight percent (8%).  GA. CODE ANN. §§ 7-3-1, *et seq.*; GA. CODE ANN. §§ 16-17-1, *et seq*.

Chapter 17 of Title 16 of the Georgia Code is commonly referred to as the "Payday Lending Act," even though it applies to installment loans as well. Similarly, Plaintiffs may refer to the loans and lending practices at issue in this litigation as "payday loans" or "payday lending," even though the loans to Plaintiffs and members of the Class may be more accurately defined as installment loans. Regardless of whether the term "payday loan" or "installment loan" is used hereafter, the lending practices at issue pertain to loans of $3,000 or less made to Georgia borrowers at interest rates that exceed eight percent (8%).

majority of the profits. The purpose of this litigation is to shed light on this criminal enterprise that was established with the intent of evading state lending laws, to return the illegal gains to the exploited borrowers, to obtain statutory damages in accordance with Georgia and federal law, and to enjoin the Defendants from continuing their illegal practices with Georgia borrowers.

2.    Attempting to insulate themselves from legal liability for their usurious lending practices, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a lender associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe — or to at least create the illusion that it enjoys tribal immunity.

3.    In this instance, Defendant Matt Martorello used the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to set up a lending entity supposedly beyond the reach of state and federal licensing and lending laws. Under the rent-a-tribe model, Defendants made high-interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claims to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), funded the loans, controlled the underwriting, and handled the day-to-day operations of the business.

4.    Big Picture Loans served as a front to disguise Martorello's and his company's roles and to ostensibly shield the scheme by exploiting tribal sovereign

immunity. In return for the use of its name to exploit claims of tribal sovereign immunity, the Tribe received about two percent (2%) of the revenue from the loans.[2]

5. In approximately January 2016, Ascension Technologies, LLC ("Ascension Technologies") acquired Bellicose Capital. Like Big Picture Loans, Ascension Technologies claims to be owned and operated by the Tribe.[3] Despite

---

[2] Zeke Faux, Payday Lenders are Changing the Game Ahead of a U.S. Crackdown, Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue…."). https://bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown (last visited June 27, 2018).

[3] This lawsuit challenges Big Picture Loans' and Ascension Technologies' anticipated claim that they are an "arm of the Tribe" and thus entitled to the protection of sovereign immunity. Although the doctrine of tribal sovereign immunity protects the Tribe itself, the Supreme Court of Georgia has held that this state's jurisdiction over predatory payday lending practices is not defeated by tribal sovereignty, because the subject of the litigation involves non-discriminatory civil and criminal laws regulating conduct beyond the boundaries of the Native Americans' reservation. *See also Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 348, 793 S.E.2d 357, 366-67 (2016). Additionally or alternatively, the tribal sovereignty does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 293 (Minn. 1996)). In addition to the analysis in this Complaint concerning the creation, purpose, and business structure of Big Picture Loans and Ascension Technologies, these companies are not entitled to sovereign immunity because the conduct at issue occurred outside of the reservation boundaries; the vast majority of the profits from the scheme went to non-tribal participants; the companies are not wholly

the alleged tribal ownership, Ascension Technologies continues to conduct its business off of the tribal reservation and generate massive profits for Martorello. In fact, Ascension Technologies conducts a significant amount of its illegal operations at its corporate offices in this Division. On information and belief, at all times relevant to this litigation, the Tribe has had no direct control over the income, expenses, or day-to-day operations of Big Picture Loans, Bellicose Capital, or Ascension Technologies. Further, on information and belief, the Tribe does not fund the loans or handle the servicing or collection of the loans.

6.   From their respective residences in Georgia, Plaintiffs, Victoria Renee McKoy and Desiree Wright Lovins, received short-term installment loans. Through online application and confirmation by telephone, Ms. McKoy obtained an $800 loan from Big Picture Loans with bi-weekly payments of $189.08. Similarly, Ms. Lovins received a loan of $300 with payments of $145.12 deducted from her account every month. Neither Plaintiff was told that the interest rate for their respective loans would exceed 550%. Plaintiffs were not given the opportunity to consider Big Picture Loans' agreement and were not informed that it would attempt to set aside their rights under Georgia law.

---

owned, operated, and/or controlled by the Tribe; and the companies were established for the sole purpose of evading state usury laws. Further, extending the protections of tribal immunity to Defendants' scheme would not serve the policies underlying tribal sovereign immunity.

7.   Plaintiffs assert a class claim for Defendants' violations of Georgia's lending statutes. Short term loans under $3,000 at an interest rate that exceeds eight percent (8%) from a non-bank lender are illegal under Georgia law. GA. CODE ANN. §§ 16-17-1, *et seq*. Defendants' loan transactions were made in violation of § 16-17-2 of the Payday Lending Act and should be declared null and void *ab initio*. GA. CODE ANN. § 16-17-2. Defendants also violated the Industrial Loan Act by making and collecting loans as an unlicensed lender that greatly exceed the maximum legal interest rate under Georgia law. GA. CODE ANN. §§ 7-3-1, *et seq*. For making the unlicensed, usurious loans, the Defendants' loans are void and unenforceable, and the Defendants and related third parties may not collect, obtain, or receive any principal or interest on the loans. GA. CODE ANN. § 7-3-29(a). In a judgment entered against the Defendants jointly and severally, the Court should order that the debts at issue are void and that Defendants must repay the principal and interest as well as statutory damages equal to three times the amount of any interest or other charges to the borrowers arising out of Defendants' loan transactions. GA. CODE ANN. § 16-17-3.

8.   Defendants' conduct, as alleged herein, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants acted in concert and conspired with others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and

the Class members. In violation of the statute, Defendants sought to collect, and did collect on usurious, "unlawful debts" under 18 U.S.C. § 1961(6), specifically Defendants collected debts incurred in "the business of lending money" where the "usurious rate is at least twice the enforceable rate" under state or federal law. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

9.   Defendants' operations also violated the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO Act"), GA. CODE ANN. §§ 16-14-1, *et seq.*  Specifically, Defendants participated in, and conspired to participate in, a pattern of racketeering activity through the violation of the Georgia Payday Lending Act. GA. CODE ANN. §§ 16–14–3(9)(A)(xxxviii), 16-14-4(a), 16-14-4(c). As a proximate result of these unlicensed and illegal operations, Defendants systematically charged excessive and usurious interest rates to Plaintiffs and the Class. To address this wrongful conduct, the Court should enjoin the Defendants from further misconduct as permitted by statute as well as award three times actual damages, punitive damages, attorneys' fees, and reasonable investigation and litigation costs. GA. CODE ANN. § 16–14–6.

10. In the alternative, Plaintiffs also assert a class claim for Defendants' unjust enrichment. Defendants were unjustly enriched by their receipt of any payments on the void and uncollectable loans. It would be inequitable for the Defendants to accept or retain the benefit conferred by their unlicensed and

usurious lending scheme, namely the collection on illegal loans. Under this alternative theory of recovery, Plaintiffs further seek injunctive and/or declaratory relief in the form of debt forgiveness on all pending and future loans with Georgia borrowers. Plaintiffs further seek the collection of attorneys' fees and costs to the extent permissible under state and federal law.

11.  Plaintiffs also seek a declaratory judgment that the choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they violate Georgia law. GA. CODE ANN. § 16-17-2(c)(1) (prohibiting loan agreements involving Georgia residents from including choice of law and forum selection provisions that designate a law other than Georgia law or a court other than the county in which the borrower resides); GA. CODE ANN. § 16-17-2(c)(2) (prohibiting unconscionable arbitration provisions). Additionally, the terms of the loan agreement are void and unenforceable because they are unconscionable and against public policy. For example, the loan agreement seeks to disclaim all federal and state laws in favor of "tribal law." The choice of law, dispute resolution, and class action waiver provisions offer no forum for a just and fair adjudication of Plaintiffs' rights and obligations. As addressed by the Georgia Supreme Court, out-of-state lenders cannot circumvent the Payday Lending Act by drafting "an agreement to contract around it." *Western Sky Financial, LLC*, 300 Ga. at 347, 793

S.E.2d at 366. These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy.[4]

## II. JURISDICTION AND VENUE

12.  This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff, Victoria Renee McKoy, is a resident of this District and a substantial part of Plaintiffs' claims occurred in this Division of the Northern District of Georgia. Additionally, Defendant Ascension Technologies is a foreign limited liability corporation with operations in Atlanta, Georgia and a registered agent for service of process in this Division.

## III. PARTIES

14.  Plaintiff Victoria Renee McKoy ("McKoy") is a natural person and resident of Buford in Gwinnett County, Georgia.

---

[4] For example, in two recent cases, the Fourth Circuit held that similar provisions were unenforceable for violating public policy. *Hayes v. Delbert Services Corp.,* 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *see also Dillon v. BMO Harris Bank, N.A.,* 2017 WL 1903475, at *4 (4th Cir. 2017) ("[W]e interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law.*").

15. Plaintiff Desiree Wright Lovins ("Lovins") is a natural person and resident of Valdosta in Lowndes County, Georgia.

16. Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. Big Picture Loans is the successor in interest of Red Rock Tribal Lending, LLC and Castle Payday (collectively referred to hereafter as "Big Picture Loans").[5] Big Picture Loans was formed in approximately August 2014. Big Picture Loans does business in Gwinnett County, Lowndes County, and throughout the State of Georgia and the United States.

17. Defendant Matt Martorello is a natural person and resident of Dallas, Texas and/or Dorado, Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise. Martorello does business in Gwinnett County, Lowndes County, and throughout the State of Georgia and the United States.

---

[5] Castle Payday, We Have Big News! Castle Payday is now Big Picture Loans, https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited June 27, 2018).

18. Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC ("Ascension Technologies") is a limited liability company. Bellicose Capital was formed in approximately 2011 under the laws of the U.S. Virgin Islands and then Puerto Rico. Based on available evidence, Ascension Technologies' principal place of business is in Atlanta, Georgia. On information and belief, Bellicose Capital procured the investment capital, serviced the loans, and received the vast majority of the revenue from loans created through Big Picture Loans. In approximately April 2016, Martorello transferred, sold, or merged Bellicose Capital into Ascension Technologies, a subsidiary of Tribal Economic Development Holdings, LLC, in an attempt to shield Bellicose Capital's illegal business practices. Although the nominal ownership of the company changed, Ascension Technologies continues to funnel a significant amount of its income to Martorello and/or other non-tribal members.[6] Further, Ascension Technologies operates independent of the Tribe with most of its business services and operations based in Atlanta, Georgia and Puerto Rico. Ascension Technologies is a foreign limited liability corporation licensed to do business, and doing business, in the State of Georgia. Having designated a registered agent for service of process in Gwinnett County,

---

[6] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Martorello is selling Bellicose to the tribe for just $1.3 million upfront, plus as much as $300 million in future payments, depending on how the business does.").

Georgia, Ascension Technologies has agreed that it is amenable to suit in this jurisdiction, and it has agreed to operate subject to the laws of this State. Ascension Technologies does business in Gwinnett County, Lowndes County, and throughout the State of Georgia and the United States.

19.  Defendant Daniel Gravel ("Gravel") is a natural person and resident of Leesburg, Virginia. Gravel was the general counsel for Bellicose Capital and was one of the masterminds of the rent-a-tribe lending scheme described herein. As early as August 2012, Gravel had direct personal involvement in the day-to-day operations of the illegal enterprise and participated in the management of the legal affairs of the company, including drafting and reviewing the software, financial, payment processing, and servicing contracts that enabled the enterprise to operate. Additionally, Gravel drafted and reviewed all advertising and marketing materials for the enterprise and made the decisions regarding the legal content in the websites and contracts. Gravel does business in Gwinnett County, Lowndes County, and throughout the State of Georgia and the United States.

## IV. FACTUAL ALLEGATIONS

### A.  Victoria Renee McKoy

20.  On or about January 25, 2018, Victoria Renee McKoy applied online for a short-term loan from her residence in Gwinnett County, Georgia.

21. Shortly after completing an online application, a Big Picture Loans representative called Ms. McKoy, informed her that she was eligible for an $800 loan, and noted that she would be making payments of $189.08 every two weeks.

22. The Big Picture Loans representative did not explain that the annual percentage rate for her loan would be 556.63% or that the anticipated finance charges for her loan would be a total of $1,657.82.

23. During the same call from the Big Picture Loans representative, Ms. McKoy was sent an email with an internet link that would enable her to complete the loan application process.

24. The Big Picture Loans representative made sure that Ms. McKoy digitally signed the loan document and returned/submitted it before she got off the phone.

25. The Big Picture Loans representative did not explain the terms of the loan agreement, and knew that Ms. McKoy could not have read the six-page document.

26. Ms. McKoy was not aware that, according to the terms of her loan, she was purportedly waiving her rights as a Georgia consumer under the loan.

27. On or about January 25, 2018, Ms. Lovins received a deposit into her account for $800.

28. From February 9 through May 5, 2018, Big Picture Loans deducted six payments of $189.08 from Ms. McKoy's account for a total of $1,323.56 in repayment of the loan.

29. Thereafter, Ms. Lovins learned that Big Picture Loans applied almost all of her payments as interest. According to Big Picture Loans, Ms. Lovins reduced her loan balance from $800 to roughly $600, after payments of $1,323.56.

## B.   Desiree Wright Lovins

30. On or about December 30, 2017, Desiree Wright Lovins applied online for a short-term loan from her residence in Lowndes County, Georgia.

31. Ms. Lovins filled out the application in the name of "Desiree Wright," which was her name before marriage and the name recognized by her bank.

32. Shortly after completing an online application, Ms. Lovins received a call from a Big Picture Loans representative.

33. The Big Picture Loans representative told Ms. Lovins that she was eligible for, and would receive, a loan of $300 and that her repayment would be in the amount of $145.12 deducted from her account every month.

34. The Big Picture representative did not explain that the annual percentage rate for her loan would be 591.46% or that the anticipated finance charges for her loan would be a total of $1,005.84.

35. During the same call from the Big Picture Loans representative, Ms. Lovins was sent an email with an internet link for her to complete the loan application process.

36. The Big Picture Loans representative made sure that Ms. Lovins digitally signed the loan agreement and returned/submitted it before she got off the phone.

37. The Big Picture Loans representative did not explain the terms of the loan agreement and knew that Ms. Lovins could not have had time to read them.

38. Ms. Lovins was not aware that, according to the terms of her loan, she was purportedly waiving her rights as a Georgia consumer under the loan.

39. On or before January 5, 2018, Ms. Lovins received a deposit into her account for $300, the loan amount.

40. From February 1 through June 1, 2018, Big Picture Loans deducted five payments of $145.12 from Ms. Lovins' account, for a total of $725.60 in repayment of the loan.

41. Thereafter, Ms. Lovins learned that Big Picture Loans applied almost all of her payments as interest on her $300 loan. According to Big Picture Loans, Ms. Lovins still owes them approximately $200 after timely payments of $725.60.

42. On June 8, 2018, Ms. Lovins called Big Picture Loans and demanded that the lender stop taking automatic withdrawals from her account.

# V. CLASS ALLEGATIONS

## A. Georgia Consumer Finance Laws and Licensing Requirements Protect Georgia Residents from Defendants' Predatory Lending Practices

### 1. Georgia's Payday Lending Act Prohibits Abusive Payday Lending Practices

43. The State of Georgia has taken aggressive measures to protect Georgia residents from predatory lending practices.

44. "[I]n the State of Georgia the practice of engaging in activities commonly referred to as payday lending, deferred presentment services, or advance cash services and other similar activities are currently illegal," and to prohibit such lending practices, the state has imposed "substantial criminal and civil penalties." GA. CODE ANN. § 16-17-1(c) and (e).

45. Sections 16-17-1 through 16-17-10 of the Georgia Code are commonly referred to as the "Payday Lending Act"; however, the statute applies not only to what is commonly referred to as "payday lending" but to any business that involves the lending of $3,000 or less unless the loan falls within the exceptions set forth in section 16-17-2, none of which apply in this case. GA. CODE ANN. § 16-17-2. *See also Western Sky Financial, LLC v. State ex rel. Olens*, 300 Ga. 340, 343, 793 S.E.2d 357, 363 (2016).

46. Although other Georgia statutes impose interest rate limits, licensure requirements, and other restrictions on consumer lending practices, the Payday

Lending Act is intended as an additional deterrent to high-interest, short-term lending practices. *Western Sky Financial, LLC*, 300 Ga. at 343, 793 S.E.2d at 363.

47.  The Payday Lending Act prohibits lenders from using "mail, electronic means, the Internet, or telephonic means" to make consumer loans. GA. CODE ANN. § 16-17-2(a).

48.  Non-bank lenders outside of the state of Georgia are regulated by the Payday Lending Act. *Western Sky Financial, LLC*, 300 Ga. at 344, 793 S.E.2d at 364.

49.  Violation of the Payday Lending Act, even by an out-of-state lender, is an explicit violation of the statute and renders the loan void. GA. CODE ANN. §§ 16-17-2, 16-17-3.

50.  The Payday Lending Act prohibits lenders from enforcing choice of law provisions, venue provisions, and unconscionable arbitration provisions. GA. CODE ANN. § 16-17-2(c)(1) ("A payday lender shall not include in any loan contract made with a resident of this state any provision by which the laws of a state other than Georgia shall govern the terms and enforcement of the contract, nor shall the loan contract designate a court for the resolution of disputes concerning the contract other than a court of competent jurisdiction in and for the county in which the borrower resides or the loan office is located."); GA. CODE ANN. § 16-17-2(c)(2) (addressing unconscionable arbitration provisions).

17

51.  The Georgia Supreme Court has found that out-of-state lenders cannot circumvent the Payday Lending Act by drafting "an agreement to contract around it." *Western Sky Financial, LLC*, 300 Ga. at 347, 793 S.E.2d at 366.

52.  For loans that are made in violation of Section 16-17-2, the lender is barred from collecting on the indebtedness, because such transactions are "void *ab initio*." GA. CODE ANN. § 16-17-3.

53.  Additionally, the lender shall be held liable to the borrower "in each unlawful transaction for three times the amount of any interest or other charges to the borrower." GA. CODE ANN. § 16-17-3.

54.  Georgia law specifically empowers borrowers to pursue their civil remedies individually or "on behalf of an ascertainable class of borrowers." GA. CODE ANN. § 16-17-3.

55.  In a successful action to enforce the provisions of the Payday Lending Act, "a court shall award a borrower, or class of borrowers, costs including reasonable attorneys' fees." GA. CODE ANN. § 16-17-3.

   **2.  Georgia's Industrial Loan Act**

56.  "The purpose of [the Georgia Industrial Loan Act] is to authorize and provide regulation of the business of making loans of $3,000.00 or less and to bring within the regulation of [the Act] and within its provisions all loans of $3,000.00 or less, whether or not made by a person organized or operating under the provisions

and authority of some other statute, except those persons and loans expressly exempted by the terms of this chapter." GA. CODE ANN. § 7-3-2.

57.  A lender must be licensed to make loans of $3,000.00 or less at an interest rate exceeding eight percent (8%) unless the loan transaction is specifically exempted by the terms of the Industrial Loan Act. GA. CODE ANN. §§ 7-3-5, 7-3-6, 7-3-8.

58.  The loans that are the subject of this litigation are subject to regulation by the Georgia Industrial Loan Commissioner. GA. CODE ANN. § 7-3-6.

59.  The loans that are the subject of this litigation do not fall within any of the exemptions of the Georgia Industrial Loan Act. GA. CODE ANN. § 7-3-6.

60. If an unlicensed lender makes a loan in violation of the Georgia Industrial Loan Act, the loan is "null and void." GA. CODE ANN. § 7-3-29(a). Stated differently, where, as here, a business is not licensed to lend or collect on a loan to Georgia consumers, the entity may not receive or retain any proceeds from the loan, including repayment of the principal or any interest or other compensation as a result of the loan.

61. The Georgia Industrial Loan Act specifically provides that borrowers may prosecute claims for violation of the Industrial Loan Act against an unlicensed lender in a class action. GA. CODE ANN. §§ 7-3-29(e), 9-11-23.

**B.  Overview of Defendants' Enterprise**

62.  Over the last decade, businesses have sought to evade state lending laws by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

63.  Defendant Martorello recognized the exorbitant profits he could achieve by not complying with state usury laws and making high interest loans to desperate and vulnerable consumers, many of whom are Georgia residents.

64. Through Bellicose Capital, Martorello and Gravel established a rent-a-tribe business model with the Tribe. They assisted the Tribe in forming Big Picture Loans as a "business enterprise" of the Tribe, which then claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[7]

---

[7] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity — Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf (last viewed June 27, 2018).

65. According to tribal records, "all information and records of Big Picture are confidential," so the agreements and business operations among Defendants have not yet been fully disclosed.

66. Upon information and belief, the Tribe has had no direct control over the income or expenses of Big Picture Loans.

67. Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front. The Tribe allowed Defendants to use its name and, in return, received a nominal percentage of the revenue.[8] Bellicose Capital provided the infrastructure and investment capital to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

68. Moreover, nearly all activities performed on behalf of Big Picture Loans were performed by officers and employees of Bellicose Capital, now Ascension Technologies, who were not located on the Lac Vieux Reservation. On information

---

[8] Zeke Faux, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("[Matt Martorello's] company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue….").

and belief, Bellicose Capital employees were located in the Virgin Islands, Puerto Rico, and the Philippines.

69.  On information and belief, Bellicose Capital handled the lead generation used to identify and solicit potential consumers.[9] Bellicose Capital's lead generation procedures were developed by Martorello and Gravel.

70.  On information and belief, if a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

71. In January 2016, due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred or sold Bellicose Capital in an attempt to shield Bellicose Capital's illegal business practices. Bellicose was re-branded as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

---

[9] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. *Pew Charitable Trust, Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/-/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf (last visited June 27, 2018). Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id*.

72. As part of this arrangement, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as *$300 million* in future payments. Faux, *supra* notes 2, 6. Through several corporate shells, Martorello is receiving variable, non-regular payments that may total $300 million over the course of seven years. According to a press release by the Tribe, each of the annual payments to Martorello's company will "build additional equity in its own lending support business."[10] Thus, the Tribe acknowledges that it does not own all of the equity in the company. With the purchase structured so that Martorello's company continues to receive substantial profits, the Tribe continues to receive only a modest fee in return for the use of its name.

73. And while it is now purportedly organized under the laws of the Tribe, Ascension Technologies continues to operate in the same manner and with several of the same individuals who ran Bellicose Capital—none of whom appear to be affiliated with the Tribe.

74. Upon information and belief, tribal members do not participate in the day-to-day operations of Ascension Technologies and Big Picture Loans, and nearly all the activities associated with these companies occurred off the Tribe's

---

[10] https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html (last visited June 27, 2018).

reservation, such as the office management, business development, internet marketing, call centers, payment processing, and servicing of the loans.

75. For example, approximately 20 individuals identify Ascension Technologies as their employer on LinkedIn; however, none of these people are located on the reservation. https://www.linkedin.com/search/results/index/ ?keywords=%22ascension%20technologies%22&origin=GLOBAL_SEARCH_HE ADER (last visited June 27, 2018).

76. Three LinkedIn members claim an ownership interest in Defendant Ascension Technologies. None of these owners are residents on tribal land. Instead, the alleged owners are located near Phoenix, Arizona, Green Bay, Wisconsin, and Jackson, Mississippi. https://www.linkedin.com/search/ results/people/?facetCurrentCompany=%5B%2212899424%22%5D&keywords= ascension%20technologies%20owner&origin=GLOBAL_SEARCH_HEADER (last visited June 27, 2018).

77. Additionally, the Defendant's CEO claims to be located near Kansas City, Missouri:



https://www.linkedin.com/in/james-birch-642a805b/ (last visited June 27, 2018).

78. The company's co-founder is in the New York City area:



https://www.linkedin.com/in/bob-clyne-90b15a/ (last visited June 27, 2018).

79. The Facebook page for Ascension Technologies lists Atlanta, Georgia as its place of business.



https://www.facebook.com/pages/Ascension-Technologies-LLC/1151747724868477 (last visited June 27, 2018).

80. Ascension Technologies is a foreign limited liability company certified to do business, in the State of Georgia. The Certificate of Authority was issued by the Secretary of State for the State of Georgia on August 9, 2016, and the annual registration for the company was most recently reissued on March 8, 2018.

81. Ascension Technologies has designated Lynda Galler of Duluth, Gwinnett County, Georgia as its registered agent for service of process in the state.

82. Having designated a registered agent for service of process in Georgia, Ascension Technologies has agreed that it is amenable to suit in this jurisdiction, and it has agreed to operate subject to the laws of this State.

83. According to its employees' LinkedIn pages, Ascension Technologies conducts its risk analysis, database development, analytics, database marketing, strategic marketing, digital marketing, information technology, and information security in Atlanta, Georgia. At least two corporate vice presidents work in Atlanta.



https://www.linkedin.com/search/results/people/?facetGeoRegion=%5B%22u
s%3A52%22%5D&keywords=%22ascension%20technologies%22&origin=FACET
ED_SEARCH (last visited June 27, 2018).

84. In Puerto Rico, where Martorello claims his residence, Ascension Technologies has additional business operations.[11] According to the LinkedIn pages of its employees, corporate office management for Ascension Technologies occurs from Puerto Rico. Additionally, the company's predictive modeling, data science, and compliance testing are conducted in Puerto Rico. James Dowd, one of the corporate vice presidents of Ascension Technologies, is located in Puerto Rico; Mr. Dowd was formerly a director of Bellicose Capital.

85. Ascension Technologies' director of business development is located in Chattanooga, Tennessee, and on his LinkedIn page, he describes the company's business as follows:

---

[11] https://www.linkedin.com/search/results/people/?facetCurrentCompany
=%5B%2212899424%22%5D&keywords=ascension%20technologies%20puerto%2
0rico&origin=GLOBAL_SEARCH_HEADER (last visited June 27, 2018);
https://www.linkedin.com/search/results/people/?facetCurrentCompany=%5
B%2212899424%22%5D&keywords=ascension%20technologies%20manager&ori
gin=GLOBAL_SEARCH_HEADER (last visited June 27, 2018).



**Director of Business Development**
Ascension Technologies, LLC
Aug 2016 – Present • 1 yr 11 mos

Ascension Technologies, LLC is a wholly owned subsidiary of Tribal Economic Development Holdings, LLC, a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe.

The team at Ascension Technologies, LLC has an extensive history in servicing lending portfolios, helping hundreds of thousands of people to achieve their financial goals. They specialize in facilitating personal, unsecured loans and financing, as well as the building of risk models, marketing, and providing customer service. Ascension does this by using cutting-edge technology, big data, and creative innovation to provide a transparent, frictionless, and highly efficient marketplace for the everyday borrower. Ascension effectively automates all aspects of operations while ensuring the ability to scale the lending portfolio, including the borrower application process, regulatory compliance, credit decisions, and underwriting. Combining strategic, technical, operational and organizational expertise with proven disciplined approaches, Ascension builds solutions that get results

https://www.linkedin.com/in/ben-u-63532012/ (last visited June 27, 2018).

86. Ascension Technologies' vice president of marketing in Atlanta describes her position as follows:



**Vice President Marketing**
Ascension Technologies, LLC
Nov 2016 – Present • 1 yr 8 mos
Atlanta, Georgia

Create and lead data-driven omni-channel marketing strategies and tactics for customer acquisition and retention in B2C sub-prime lending. Drive strategy, brand, digital, traditional and emerging channels to deliver marketing success. Use data and sophisticated analytics to accelerate revenue growth.

https://www.linkedin.com/in/lorialsterberg/ (last visited June 27, 2018).

87. Ascension Technologies' director of digital marketing in Atlanta describes his position at the company as follows:



**Director of Digital Marketing**
Ascension Technologies, LLC
Jan 2017 – Present • 1 yr 6 mos
Greater Atlanta Area

Vertical – B2C Online Personal Lending – Big Picture Loans – www.bigpictureloans.com

Responsible for all digital marketing & advertising for Big Picture Loans including; mixed-media channel budget planning & multi-channel integration, partner directly with Direct Mail channel owner, ensuring all creative assets and messaging unify both the digital and offline customer journey

Directly hands-on, build & manage all digital marketing campaigns and strategies including; SEO, SEM, Social, Programmatic, Content Marketing & Amplification, email Marketing, Campaign Landing Page Development, Re-targeting and Marketing Automation

Directly manage all Paid Search accounts and Programmatic Display strategy leads through testing, campaign optimizations and budget allocations

Develop and manage all CRM touch points including; direct marketing, email marketing (customer lists exceeding 2MM), retention strategies, and new customer acquisition initiatives via Hubspot

Lead and spearhead the redesigned of Big Picture Loans Website, hands-on built landing pages, designed and sourced digital assets, photo selections and architected all UX/Conversion Optimization strategy

Establish and manage all Social Media channel presence, including identifying and targeting audience segmentation, reporting, budget recommendations and content publishing

Create, manage, source and publish all digital content in a variety of shareable and downloadable formats

Build, manage and report on all cross-channel digital marketing efforts through various campaign strategies and performance metrics

https://www.linkedin.com/in/mike-richardson-9048204/ (last visited June 27, 2018).

88. Upon information and belief, none of Ascension Technologies' employees, referenced above, are members of the Tribe.

89. Nearly all of the activities of Ascension Technologies are performed by these non-tribal members who are located off the reservation.

### C.  Defendants' Lending Practices Violated Georgia Law

90. Defendants were aware that Georgia law prohibits unlicensed lenders from making loans for less than $3,000 at interest rates exceeding eight percent.

91. Based on information and belief, Defendants knew that their lending practices were at interest rates that greatly exceeded the maximum interest rates as set by state usury laws and payday lending laws.

92. Through advertising and marketing, Defendants targeted Georgia consumers for their lending practices, including the loans to Plaintiffs.

93. Martorello and Gravel chose Georgia as a place where loans and collection efforts would ensue, and they participated in and knew of the actions of the other Defendants in Georgia.

94. Martorello and Gravel knew the subject loans were illegal under Georgia law, but they pursued the scheme anyway through Big Picture Loans and Bellicose.

95. In order to qualify for Defendants' loan product, Georgia consumers were required to electronically sign a form contract created by Defendants—not created by the Tribe.

96. Under the terms of the standard loan agreement, the interest rates charged were significantly greater than the maximum legal rate that can be charged under Georgia law.

97. For example, Defendants loaned $800 to Victoria Renee McKoy with interest at an annual percentage rate ("APR") of 556.63%, and they loaned $300 to Desiree Wright Lovins at an APR of 591.46%.

98. At all times relevant to this litigation, none of the Defendants had a consumer finance license permitting them to make loans in Georgia. *See* Ga. Code Ann §§ 7-3-5, 7-3-6, 7-3-8. The Tribe also did not have a consumer finance license in Georgia.

99. Based on information and belief, the Defendants have never attempted to obtain a license to become a lender under Georgia law.

100. Accordingly, Defendants' loans to Georgia residents are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiffs. *See* ¶¶ 44-65, *supra*.

## D. Defendants' Loan Agreements, Including Choice-of-Law, Dispute Resolution, and Class Action Waiver Provisions, Are Void and/or Unenforceable

101. Because the loans were made and collected without a consumer finance license and charged an interest rate in excess of the maximum rate permitted under Georgia law, the agreements are void and unenforceable.

102. Defendants' loan agreement not only violates Georgia's Payday Lending Act, its Industrial Loan Act, and the public policy against usurious loans,

but it also contains unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim laws and legal rights and ultimately deprive consumers of their day in court.

103.   For example, Defendants' Loan Agreement with Plaintiffs provides:

> **GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.
>
> **SOVEREIGN IMMUNITY**: This Agreement and all related documents are being submitted by You to Big Picture Loans, LLC at its office on Tribal land. The Lender is an economic development arm, instrumentality, and limited liability company wholly owned and operated by the Tribe. The Tribe is a federally recognized Indian Tribe and is generally immune from suit as a sovereign nation unless such immunity is waived by the Tribe in accordance with Tribal law or abrogated by applicable federal law ("tribal sovereign immunity"). Because the Tribe and Lender are entitled to tribal sovereign immunity, You will be limited in what claims, if any, You may be able to assert against both the Tribe and Us. To encourage resolution of consumer complaints as well as provide an authorized method of dispute resolution for consumers, pursuant to Section 9 of the Code, all complaints lodged, filed, or otherwise submitted by You or on Your behalf must follow the Tribal Dispute Resolution Procedure, as described herein.

**PRESERVATION OF SOVEREIGN IMMUNITY**: It is the express intention of the Tribe and Lender, operating as an economic arm-of-the-tribe, to fully preserve, and not waive either in whole or in part, exclusive jurisdiction, sovereign immunity, and any other rights, titles, privileges, and immunities, to which they are entitled including the tribal sovereign immunity of the Tribe and Lender. To protect and preserve the rights of the parties, no person may assume a waiver of immunity exists except by express written resolution of the Tribe's Tribal Council specifically authorizing such a waiver as required by Article XIII of the Tribe's Constitution specifically for the matter in question.

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Lender intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by You or on Your behalf to follow the Procedure. Under the Procedure, if You in the course of Your otherwise lawful and proper use of Lender's business believe Yourself to be harmed by some aspect of the operation of any part of Lender's business, You must direct Your concerns or dispute to Lender in writing. Your complaint to the Lender shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of tribal sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. The Lender will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of Your written complaint. In the event that You are dissatisfied with the Lender's determination, You may initiate Formal Dispute Resolution by requesting an administrative review of Lender's determination by submitting such request in

> writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Lender's determination. The Authority may hold an administrative review hearing, if requested by You or Us, which will occur within sixty (60) days after the Authority receives Your written request. The Authority will send notice to You and Us when a request for a hearing is granted or denied. At any such hearing, You may be represented by legal counsel at Your own expense. You may appeal an Authority decision and order by filing a written petition for review with the Tribal Court within ninety (90) days after the Authority issued its decision and order.

(McKoy Loan Agreement, attached as Exh. 1, at 4–5; Lovins Loan Agreement, attached as Exh. 2, at 4-5.)

104.   Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Big Picture Loans.

105.   The foregoing provisions are illegal under Georgia law. GA. CODE ANN. §§ 7-3-29(e), 9-11-23, 16-17-2(c)(1), 16-17-2(c)(2).

106.   Defendants' loan agreement contains unconscionable and unenforceable choice-of-law and forum selection provisions that seek to disclaim federal and state laws in favor of Tribal law.

107.   Defendants' choice-of-law provision is unenforceable as a matter of federal law because it purports to disclaim all federal law.

108.    Defendants' choice-of-law provision is unenforceable as a matter of Georgia law because it purports to disclaim the application of any state law.

109.    Likewise, the forum selection clause is also unenforceable because it deprives Georgia borrowers of *any* forum to bring state or federal law claims.

110.    The loan agreement disclaims that Plaintiffs and the Class have any right to pursue either litigation or arbitration by a neutral third party. (March 6, 2018 Loan Agreement, attached as Exh. 1, at 5. ("NO LITIGATION OR ARBITRATION IS AVAILABLE") (emphasis in original).)

111.    Instead, the Tribal Dispute Resolution Procedure only purports to allow consumers to follow a "Formal Dispute Resolution" with the Tribal Financial Services Regulatory Authority and the Tribal Court. (*Id.*)

112.    The Tribal Dispute Resolution Procedure states that consumers do not have "any binding procedural or substantive rights" against Big Picture Loans. (*Id.*)

113.    The Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.1(B)(4), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited June 27, 2018).

114.    Specifically, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." *Id.*, Reg. 1.1(B)(4)(b).

115.    Further, the Regulations only provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." *Id.*, Reg. 1.1(B)(4)(c) (emphasis added).

116.    Defendants' loan agreement violates Tribal law, which requires that the following provisions must be conspicuous: "Governing Law and Forum Selection," "Sovereign Immunity," and "Preservation of Sovereign Immunity." Specifically, under Tribal law, each of these paragraphs must be included "**in bold or all caps and conspicuously placed**." Tribal Cons. Fin. Servs. Reg. Code § 7.2(a); Tribal Fin. Servs. Auth. Comm'n Regs., Reg. 1.5(B) (emphasis added), *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf (last visited June 27, 2018).  None of the provisions were conspicuous in the subject loan.

117.    Defendants' governing law clause is unenforceable because it violates public policy concerns in Georgia and was procured through fraud and misrepresentations, including that Big Picture Loans was "wholly owned and operated by the Tribe."

118.   These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

119.   In reality, the loans were owned and/or operated by non-tribal members, including Ascension Technologies, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

120.   Through the Tribal regulatory code and class action waiver provision, Defendants also seek to deprive borrowers of any just and cost-effective means of seeking redress for Defendants' wrongful acts.

121.   The Tribal regulatory code prohibits an award of attorneys' fees or costs to the borrower, if she were to prevail in the Tribe's formal dispute resolution procedure. Tribal Cons. Fin. Servs. Regulatory Code § 9.3(i). Big Picture Loans, on the other hand, is permitted to recover attorneys' fees and reasonable costs for the collection of a debt. *Id.,* § 7.2(c).

122.   Similarly, the loan agreement seeks to strip Plaintiffs of the opportunity to pursue their claims as a class action. (McKoy Loan Agreement, attached as Exh. 1, at 5; Lovins Loan Agreement, attached as Exh. 2, at 5 ("All disputes including any Representative Claims against Us and related third parties shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on

an individual basis with You as provided for pursuant to Tribal law.") (emphasis in original).)

123.    Defendants' class-action waiver is unenforceable under Georgia law. GA. CODE ANN. §§ 7-3-29(e), 9-11-23, 16-17-2(c)(1).

124.    In essence, Defendants use the forum selection and choice of law clauses to convert the terms of the loan agreement into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

## E.  Class Definitions

125.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 for the following Class:

> All persons: (1) who executed a loan with Big Picture
> Loans, (2) when they resided or were located in Georgia,
> (3) where the loan was originated and/or any payment
> was made on or after July 3, 2014.

126.    **Numerosity**. Fed. R. Civ. P. 23(a)(1). Upon information and belief, Plaintiffs allege that the Class members are so numerous that joinder of all is impractical. The names and addresses of the Class members are identifiable through the internal business records maintained by Defendants, and the Class members may be notified of the pendency of this action by published and/or mailed notice.

127.   **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P. 23(a)(2) & (b)(3). Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common questions include, as to the Class:

(a)   whether the choice-of-law, forum selection, dispute resolution, and class action waiver provisions in Defendants' loan agreement violate Georgia law, offend public policy interests, and should be deemed unenforceable;

(b)   whether the Defendants were licensed to make loans to Georgia residents;

(c)   whether the failure to obtain the license renders the loans to Plaintiffs and the class members void and/or unenforceable;

(d)   whether the loans made by Defendants violated the Payday Lending Act, as previously alleged. Ga. Code Ann. §§ 17-16-1, *et seq.*;

(e)   whether the loans made by Defendants violated the Georgia Industrial Loan Act, as previously alleged. Ga. Code Ann. §§ 7-3-1, *et seq.*;

(f)   whether the Defendants participated in an enterprise under RICO;

(g) whether the loans to Georgia residents included interest rates at more than twice the legal maximum APR, in violation of Georgia usury laws;

(h) whether Plaintiffs and the class members conferred a benefit on Defendants because of their payments of principal and interest on Defendants' void and unenforceable loans;

(i) whether Defendants knew or should have known of the benefit conferred;

(j) whether Defendants retained an unjust benefit because the loan was void;

(k) whether the Defendants violated the elements of 18 U.S.C. § 1962(c), as previously alleged;

(l) whether the Defendants entered into a series of agreements to violate § 1962(c); and

(m) what is the proper recovery for Plaintiffs and the Class members against each Defendant.

128. **Typicality**. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each Class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the Class. All are based on the same facts and legal theories.

129.   **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives of the Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

130.   **Superiority**. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

131. **Injunctive Relief Appropriate for the Class**. Fed. R. Civ. P. 23(b)(2). Class certification is also appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the Class members. Plaintiffs and the Class seek an injunction prohibiting Defendants from collecting any further amounts from Georgia consumers in connection with their loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies, as well as ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

## VI. CAUSES OF ACTION

## COUNT ONE  – DECLARATORY JUDGMENT

132. Plaintiffs incorporate each of the allegations in the preceding paragraphs as if restated here.

133.   Defendants' loan agreement contains illegal and unconscionable choice of law, forum selection, class action waiver, and dispute resolution provisions that violate Georgia law and are void and unenforceable for public policy concerns.

134.   The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the Loan Agreement as well as the validity, if any, of the choice of law, forum selection, class action waiver, and dispute resolution provisions.

135.   Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

136.   Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, seek a declaratory judgment that the choice of law, forum selection, class action waiver, and dispute resolution provisions are void and unenforceable as to Georgia residents because such terms (a) violate Georgia law, and (b) are unconscionable and contrary to matters of public policy.

**COUNT TWO  – VIOLATIONS OF GEORGIA LENDING LAWS**

137.   Plaintiffs incorporate each of the allegations in the preceding paragraphs as if restated here.

138.    In their loans to Georgia consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Georgia law.

139.    Defendants made loans to Georgia consumers even though they are not licensed to make loans in the State of Georgia.

140.    In their loans to Georgia residents, including Plaintiffs and Class members, Defendants violated the Payday Lending Act. GA. CODE ANN. §§ 16-17-1, *et seq.*

141.    In their loans to Georgia residents, including Plaintiffs and Class members, Defendants violated the Georgia Industrial Loan Act. GA. CODE ANN. §§ 7-3-1, *et seq.*

142.    Plaintiffs and the Class Members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. GA. CODE ANN. § 16-17-2. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

143.    Because the loans at issue are void and unenforceable, Plaintiffs and the Class request that the Court enter judgment against the Defendants jointly and

severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans and award damages equal to three times the amount of any interest paid by the borrowers arising out Defendants' loan transactions. GA. CODE ANN. §§ 16-17-2, 16-17-3. Plaintiffs further seek the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Georgia law.

144.   Additionally, Plaintiffs and the Class request that the Court permanently enjoin Defendants from violating the provisions of the Payday Lending Act, including but not limited to:

1. engaging in any business, in whatever form transacted, including but not limited to by mail, electronic means, the Internet, or telephonic means, that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less in the State of Georgia;

2. advertising, marketing, or soliciting in the State of Georgia for a business that consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less through any media, including but not limited to the Internet, television, print, and radio;

3. collecting or attempting to collect payment of interest or principal pursuant to any loan agreement with any person in the State of Georgia;

4. enforcing or attempting to enforce any loan agreement with any person in the State of Georgia in any court or other tribunal, including but not limited to the Tribal

authority of the Lac Vieux Desert Band of Lake Chippewa Indians; and

5. selling or assigning any agreement for a non-mortgage loan of $3,000.00 or less between Defendants and any person residing in the State of Georgia to any third party.

145. Plaintiffs further request the Court enter an injunction prohibiting Defendants from collecting any further amounts from Georgia consumers in connection with their loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and requiring Defendants to delete any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

### COUNT THREE – VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

146. Plaintiffs incorporate each of the allegations in the preceding paragraphs as if restated here.

147. At all relevant times, Big Picture Loans, LLC, Ascension Technologies, LLC f/k/a Bellicose Capital, LLC, Matt Martorello, and Daniel Gravel were members and associates of an internet payday lending enterprise, whose members and associates engaged in the collection of unlawful debt.

148. The Defendants, including their leadership, membership, and associates, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.

149.    The enterprise is engaged in, and its activities affect, interstate commerce. The Defendants' leadership is based in Atlanta, Georgia, Denver, Colorado, Chattanooga, Tennessee, and other locations as addressed in preceding paragraphs. Defendants' enterprise operates throughout the United States, including the Northern District of Georgia, as well as in Puerto Rico and the Philippines. Additionally, Defendants claim to do business on Tribal lands.

150.    The Defendants work together as an ongoing organization whose members function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

151.    As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

152.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

153.    The means and methods by which the Defendants and other members and associates conducted and participated in the conduct of the affairs of the

enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Georgia, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Georgia law, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

154. All of the loans made to Georgia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Georgia.

155. In operating and conducting the affairs of the enterprise, the Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise.

156. The predicate acts of collection of unlawful debt are described herein and in particular in paragraphs 20-42 and 67-105 herein. The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable.

157. The Defendants' leadership, management, and participation in the enterprise began at some point as early as 2011, following the formation of Red Rock Tribal Lending, LLC, continued with the formation of Defendant Big Picture

Loans in 2014, continues to date, and will occur repeatedly in the future to the detriment of Georgia consumers.

158.   Plaintiffs and the Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c). In particular, Plaintiffs and the Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT FOUR – VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)

159.   Plaintiffs incorporate each of the allegations in the preceding paragraphs as if set forth here.

160.   Beginning as early as 2011, Defendants, as persons employed by and associated with the aforementioned payday lending enterprise, along with other participants not yet known to Plaintiffs, violated 18 U.S.C. § 1962(d) by willfully and knowingly conspiring and entering into a series of agreements to violate § 1962(c) and Georgia's usury laws—that is, to conduct and participate, directly and indirectly, in the collection of unlawful debt. In addition, Defendants knowingly entered into agreements to facilitate the development and management of the

enterprise and engaged in overt acts to further the business interests of the enterprise.

161.   Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate 18 U.S.C. § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants, including their predecessors in interest, Red Rock Tribal Lending, LLC and Bellicose Capital, to create the necessary legal frameworks and entities to conduct the affairs of the lending enterprise; (b) agreements between and among Defendants to provide the necessary funds to conduct and expand the affairs of the lending enterprise; (c) agreements between and among Defendants to investigate and solicit investors in furtherance of the affairs of the lending enterprise; (d) agreements between and among Defendants to generate high-interest loans to desperate borrowers, including residents of Georgia; (e) agreements between and among Defendants to refinance the lending enterprise, including the agreement for the acquisition of Bellicose Capital and the continued payments to Martorello; and (f) agreements between and among the Defendants and unknown third parties to further conduct the affairs of the Defendants' lending enterprise.

162.   Each of the agreements identified in the preceding paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct and furtherance of the affairs of the enterprise.

163.   As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT FIVE - VIOLATIONS OF GEORGIA RICO ACT
## GA CODE ANN. § 16-14-4(a)

164.   Plaintiffs incorporate each of the allegations in the preceding paragraphs as if restated here.

### A.  Georgia RICO Act

165.   The Georgia RICO Act was enacted by the state legislature to impose criminal penalties against those engaged in an "interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic or physical threat or injury," GA. CODE ANN. § 16-14-2(b).

166.   Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." GA. CODE ANN. § 16–14–4(a).

167.    "Racketeering activity," also known as a "predicate act," includes the commission of, or the attempt to commit, violations of the Georgia Payday Lending Act. GA. CODE ANN. § 16–14–3(9)(A)(xxxviii).

168.    A "pattern of racketeering activity" means that there have been at least two acts of racketeering activity that are interrelated and that were done "in furtherance of one or more incidents, schemes, or transactions." GA. CODE ANN. § 16–14–3(8)(A).

169.    Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. GA. CODE ANN. § 16–14–4(c).

**B.  Pattern of Racketeering Activity**

170.    Defendants have engaged in acts that constitute a repeated and systematic violation of the Georgia Payday Lending Act, specifically GA. CODE ANN. § 16-17-2, as described above in paragraphs 20-105. GA. CODE ANN. §§ 16-17-2.

171.    As detailed in the preceding paragraphs, Defendants knowingly entered into agreements to facilitate the development and management of their payday lending enterprise and engaged in overt acts to further the business interests of the enterprise in knowing violation of the Georgia Payday Lending Act.   when Defendants, as persons employed by and associated with the

aforementioned payday lending enterprise, along with other participants not yet known to Plaintiffs, willfully and knowingly conspired and entered into a series of agreements to violate Georgia's Payday Lending Act.

172.    Defendants are liable for their participation in the Georgia RICO conspiracy because they knowingly and willfully joined a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts.

173.    Each of the agreements identified in paragraph 166 contemplated that Defendants would conspire or endeavor to commit at least one collection of unlawful debt in violation of the Georgia Payday Lending Act and in furtherance of the affairs of the enterprise.

174.    This pattern of racketeering commenced as early as 2011 and continues to the present.

175.    The victims of Defendants' illegal conduct include the Plaintiffs as well as all other persons who executed a loan with Big Picture Loans when they resided or were located in Georgia.

176.    Therefore, Defendants have engaged in a pattern of racketeering activity, as defined under GA. CODE ANN. §§ 16–14–3(8)(A), 16–14–3(9)(A)(xxxviii).

**C.  Defendants are an Enterprise**

177.    Defendants Big Picture Loans and Ascension Technologies are "enterprises" as that term is defined under GA. CODE ANN. § 16-14-3(6).

178.   Additionally, as individuals "associated in fact," Defendants Martorello and Gravel planned, conspired, organized, and/or operated the corporate Defendants (and their predecessors in interest) with the intent of charging and collecting illegal and usurious interest rates from desperate Georgia consumers.

179.   Defendants and other parties currently unknown to Plaintiffs acted in concert to authorize and/or engage in conduct that violated the Georgia RICO Act while conducting affairs of the corporations, Big Picture Loans and Ascension Technologies. The corporate Defendants operated as an enterprise through their respective board of directors and/or managerial agent acting on behalf of the corporation.

180.   As participants in the illegal lending enterprise, the Defendants had (a) a purpose – to charge and collect illegal and usurious interest from desperate, unsophisticated Georgia consumers; (b) relationships among those associated with the enterprise, as specified above; and (c) longevity sufficient to permit the RICO Defendants to pursue and accomplish the enterprise's purpose.

### D.   Substantive Violations of the Georgia RICO Act

181.   In violation of GA. CODE ANN. § 16-14-4(b), Defendants have conducted or participated, directly or indirectly, in an enterprise through a pattern of racketeering activity.

182.   In violation of GA. CODE ANN. § 16-14-4(c), Defendants conspired to violate the provisions of GA. CODE ANN. § 16-14-4(b).

**E.   Injury and Remedy under the Georgia RICO Act**

183.   Plaintiffs and the Class members were injured as a result of Defendants' violation of GA. CODE ANN. § 16-4-4. In particular, Plaintiffs and the Class have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of the Georgia RICO Act and the Payday Lending Act, Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, punitive damages, investigation and litigation costs, and attorneys' fees pursuant to GA. CODE ANN. § 16-4-6(c).

184.   For the prevention of future criminal activity, the Court should enjoin Defendants from further misconduct in order to best serve the public interest. Specifically, in accordance with the authority granted under section 16-14-6 of the Georgia Code, the Court should enjoin further violations of the Georgia RICO Act (and undue financial losses to Georgia residents) by issuing appropriate orders and judgments including, but not limited to:

(a) Ordering Defendants to divest themselves of any interest in any enterprise, real property, or personal property;

(b) Prohibiting Defendants from engaging in the same type of payday lending enterprises that are the subject of this litigation;

(c) Ordering the Defendants' dissolution or reorganization; and

(d) Ordering the revocation of the certificate authorizing Defendant Ascension Technologies to conduct business within this State.

GA. CODE ANN. § 16-4-6 (noting that no showing of special or irreparable damage to the Plaintiffs is required prior to the Court's entry of this injunctive relief, including a temporary restraining order and/or a preliminary injunction).

## COUNT SIX – UNJUST ENRICHMENT

185.   Plaintiffs incorporate each of the allegations in the preceding paragraphs as if restated here.

186.   The loans made by Defendants to Plaintiffs and the Class members were void and illegal.

187.   Plaintiffs and the Class members conferred a benefit on Defendants when they repaid principal and interest on the void loans; Defendants knew of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

188.   Accordingly, Plaintiffs seeks to recover from Defendants, jointly and severally, all principal and interest repaid on Defendants' loans by Plaintiffs and the Class members.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on behalf of themselves and the Class they seek to represent against Defendants for:

(a)     Certification for this matter to proceed as a class action;

(b)     Declaratory relief, injunctive relief, actual damages, treble damages, and punitive damages, as pled herein;

(c)     Attorney's fees, investigation and litigation expenses, and costs of suit; and

(d)     Such other and further relief as the Court deems proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

This 3rd day of July, 2018.

**McRAE BERTSCHI & COLE LLC**
Suite 200, 1350 Center Drive
Dunwoody, Georgia 30338

*Counsel for Plaintiff*

/s/ Craig E. Bertschi
Craig E. Bertschi
Georgia Bar No. 055739
ceb@mcraebertschi.com
678.999.1102

Charles J. Cole
Georgia Bar No. 176704
cjc@mcraebertschi.com
678.999.1105

Of Counsel, *pro hac vice* forthcoming:

  Michael A. Caddell
  Cynthia B. Chapman
  John B. Scofield, Jr.
  Amy E. Tabor
  **CADDELL & CHAPMAN**
  628 East 9th Street
  Houston, Texas 77007

*Counsel for Plaintiff*